**Docket No. 25-684**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

MARIA LEDEZMA,

*Plaintiff-Appellant,*

v.

OPTUM, INC.,

*Defendant-Appellee.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 3:23-cv-06691-vc · Honorable Vince Chabria*

# APPELLEE'S ANSWERING BRIEF

LILAH WYLDE
lwylde@seyfarth.com
SEYFARTH SHAW LLP
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

DAWN R. SOLOWEY
dsolowey@seyfarth.com
SEYFARTH SHAW LLP
Seaport East, Suite 1200
Two Seaport Lane
Boston, Massachusetts 02210
Telephone: (617) 946-4800
Facsimile: (617) 946-4802

*Attorneys for Appellee Optum, Inc.*

COUNSEL PRESS INC. · (213) 680-2300 PRINTED ON RECYCLED PAPER

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 28(a)(1), the undersigned counsel for Appellee Optum, Inc. certifies that Optum, Inc. is a wholly-owned subsidiary of UnitedHealth Group Incorporated, which is a publicly held corporation (NYSE: UNH), which owns 10% or more of the stock of Optum, Inc.

DATED: October 16, 2025

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Dawn Solowey
Dawn Solowey
Lilah Wylde

Attorneys for Appellee
Optum, Inc.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..........................................................................iv

I. INTRODUCTION ..........................................................................1

II. JURISDICTIONAL STATEMENT ..............................................................2

III. ISSUES PRESENTED ..........................................................................3

IV. STATEMENT OF THE CASE ..........................................................................3

A. Ledezma's Employment with Optum ..................................................3

B. Optum Implemented a COVID-19 Vaccination Policy in Response to the COVID-19 Pandemic ..................................................5

C. Ledezma's Religious Exemption Request ..........................................9

D. Ledezma's Actual Alleged Objection to the COVID-19 Vaccine ..........................................................................11

E. Optum's Denial of Ledezma's Exemption Request ..........................11

F. Ledezma's Separation from Employment ..........................................13

G. Procedural History ..........................................................................13

V. SUMMARY OF THE ARGUMENT ..........................................................14

VI. STANDARD OF REVIEW ..........................................................................15

VII. ARGUMENT ..........................................................................16

A. Ledezma Cannot Establish a Prima Facie Case as a Matter of Law ..........................................................................16

1. Ledezma's objection to vaccines is not religious as a matter of law ..........................................................17

a. Ledezma's own sworn testimony demonstrates that her objection to the COVID-19 vaccination fails the Africa test and is secular, not religious, in nature ..........................................................20

b. Ledezma's admissions demonstrate that her beliefs amount to an impermissible "blanket privilege" as a matter of law ......... 23

2. Ledezma cannot show any conflict between her beliefs and COVID-19 vaccination ......... 25

3. Ledezma admitted that she did not communicate her actual beliefs against vaccination to Optum ......... 27

B. Allowing Ledezma to Enter Optum's Facilities While Unvaccinated Would Have Posed an Undue Hardship as a Matter of Law ......... 29

1. Undue Hardship Standard ......... 30

2. Optum Determined that Allowing Ledezma to Work Unvaccinated in Optum's Facilities Created an Unacceptable Health and Safety Risk ......... 32

a. Increased Risk of Exposure ......... 33

b. Staffing Shortages if Ledezma or Coworkers Tested Positive for COVID-19 ......... 36

c. Alternative Safety Measure Were Not Adequate Substitutions for Vaccination ......... 37

VIII. CONCLUSION ......... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Africa v. Commonwealth of Pennsylvania*,
662 F.2d 1025 (3d Cir. 1981)............................................................ *passim*

*Antredu v. Mass. Dep't of Youth Servs*.,
729 F. Supp. 3d 76 (D. Mass. 2024) .....................................................34

*Ashcroft v. S. Cal. Permanente Med. Grp.*,
No. 24-CV-0035-MMA-MMP, 2025 WL 268387
(S.D. Cal. Jan. 22, 2025).......................................................................18

*Beadle v. City of Tampa*,
42 F.3d 633 (11th Cir. 1995) ...............................................................32

*Berna v. Bayhealth Med. Ctr., Inc*.,
No. 23-cv-945-RGA, 2024 WL 456420 (D. Del. Feb. 5, 2024)..........................26

*Bird v. Alanson M. Randol, D.D.S., P.C.*,
No. 6:23-CV-01678-MC, 2025 WL 553580 (D. Or. Feb. 19, 2025) ..................39

*Bolden-Hardge v. Office of the California State Controller*,
63 F.4th 1215 (9th Cir. 2023) ..............................................................17

*Bordeaux v. Lions Gate Ent., Inc*.,
703 F. Supp. 3d 1117, 1135 (C.D. Cal. 2023),
*aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ................. *passim*

*Bowie v. Kaiser Found. Health Plan Inc*.,
2024 WL 3872926 (N.D. Cal. Aug. 16, 2024) ..........................................22

*Bushra v. Main Line Health, Inc*.,
2025 WL 1078135 ........................................................................ 34, 38

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................15

*Chavez v. San Francisco Bay Area Rapid Transit Dist*.,
2024 WL 332881 (N.D. Cal. Jan. 28, 2024).............................................19

*Combs v. PeaceHealth*,
No. 6:23-cv-01673-MTK, 2025 WL 92836 (D. Or. Jan. 14, 2025) ....................37

*Crawford v. Trader Joe's Co.*,
No. EDCV211519JGBSHKX, 2023 WL 3559331
(C.D. Cal. May 4, 2023) ....................................................................16

*Cruz v. Kaiser Found. Hosps.*,
No. CV 23-00630 LEK-RT, 2025 WL 951099
(D. Haw. Mar. 28, 2025)....................................................................18

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) ........................................................ 17, 19

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ..............................................................15

*Dunbar v. Twentieth Century Fox Television*,
No. CV 22-1075-DMG (JCX), 2024 WL 2107712
(C.D. Cal. Mar. 8, 2024), *motion to certify appeal denied*,
2025 WL 576584 (C.D. Cal. Feb. 10, 2025) ........................................18

*Ellison v. Inova Health Care Servs.*,
692 F. Supp. 3d 548 (E.D. Va. 2023) ............................................ 23, 24

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*,
877 F.3d 487 (3d Cir. 2017)........................................................... 22, 24

*Friedman v. S. Cal. Permanente Med. Grp.*,
102 Cal. App. 4th 39 (2002) ...............................................................18

*Geraci v. Moody-Tottrup, Intern., Inc.*,
82 F.3d 578 (3d Cir. 1996)..................................................................25

*Glasner v. AvalonBay Communities, Inc.*,
2024 WL 1600644 (C.D. Cal. Mar. 15, 2024).......................................23

*Green v. S. Lane Sch. Dist.*,
No. 6:23-CV-01630-MC, 2025 WL 691313 (D. Or. Mar. 4, 2025)....................20

*Groff v. DeJoy*,
600 U.S. 447 (2023)...................................................................... 30, 31

*Hailey v. Legacy Health*,
No. 3:23-CV-00149-IM, 2024 WL 4253238
(D. Or. Sept. 20, 2024)................................................................. 32, 34

*Howe v. Massachusetts Dep't of Correction*,
No. 4:22-CV-40119-MRG, 2024 WL 444105
(D. Mass. July 25, 2024) .................................................................37

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ..........................................................15

*Jean-Pierre v. Naples Cmty. Hosp., Inc.*,
817 F. App'x 822 (11th Cir. 2020) ....................................................32

*Keene v. City and County of San Francisco*,
No. 22-16567 (9th Cir. 2023) ..........................................................17

*Lavelle-Hayden v. Legacy Health*,
744 F. Supp. 3d 1135 (D. Or. 2024) ..................................................37

*MacDonald v. Oregon Health & Sci. Univ.*,
No. 3:22-CV-01942-IM, 2024 WL 3316199
(D. Or. July 5, 2024) .......................................................................32

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018) .....................................................................19

*Medrano v. Kaiser Permanente*,
No. 8:23-cv-02501-DOC-ADSx, 2024 WL 4432788
(C.D. Cal. Sept. 30, 2024) ................................................................23

*Medrano v. Kaiser Permanente*,
No. 8:23-CV-02501-DOC-ADSX, 2024 WL 3383704
(C.D. Cal. July 10, 2024) .......................................................... 18, 27

*Melino v. Boston Medical Center*,
127 F.4th 391 (1st Cir. 2025) ...........................................................35

*Mullen v. AstraZeneca Pharms., LP*,
No. CV-03903, 2023 WL 8651411 (E.D. Pa. Dec. 14, 2023).......... 25, 26, 27, 37

*Nidds v. Schindler Elevator Corp.*,
113 F.3d 912 (9th Cir. 1996) ..........................................................16

*Oberst v. Cnty. of Lane*,
No. 6:23-CV-01556-MC, 2025 WL 318712 (D. Or. Jan. 28, 2025) ...................27

*Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*,
992 F.3d 893 (9th Cir. 2021) ..........................................................15

*Petersen v. Snohomish Reg'l Fire & Rescue*,
No. C22-1674 TSZ, 2024 WL 278973, (W.D. Wash. Jan. 25, 2024),
*aff'd,* 150 F.4th 1211 (9th Cir. 2025)....................................................39

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) .................................................... 16, 29

*Rodrique v. Hearst Commc'ns, Inc.*,
126 F.4th 85 (1st Cir. 2025)....................................................................35

*Rolovich v. Wash. State Univ.*,
No. 2:22-cv-0319, 2025 WL 48361 (E.D. Wash. Jan. 6, 2025) ..........................38

*Sequeira v. Alameda Cnty.*,
No. C 06-01413 MEJ, 2008 WL 5179108 (N.D. Cal. Dec. 10, 2008)................16

*Snow v. Women's Healthcare Assocs., LLC*,
No. 3:23-CV-01393-IM, 2024 WL 3640111 (D. Or. Aug. 2, 2024)............. 38-39

*Stephens v. Legacy-GoHealth Urgent Care*,
No. 3:23-CV-00206-SB, 2023 WL 7612395 (D. Or. Oct. 23, 2023)..................18

*Thomas v. Review Board*,
450 U.S. 707 (1981).....................................................................................19

*Tiano v. Dillard Dept. Stores, Inc.*,
139 F.3d 679 (9th Cir. 1998) .............................................................. 19-20, 30

*Ulrich v. Lancaster Gen. Health*,
2023 WL 2939585 (E.D. Pa. Apr. 13, 2023)......................................................23

*United States v. City of Albuquerque*,
545 F.2d 110 (10th Cir. 1976) .......................................................................32

*United States v. Seeger*,
380 U.S. 163 (1965).......................................................................................19

*Weiss v. Permanente Med. Grp., Inc.*,
738 F. Supp. 3d 1217 (N.D. Cal. 2024)............................................... 24, 28

*Welsh v. United States*,
398 U.S. 333 (1970).......................................................................................19

*Williams v. Legacy Health*,
No. 22-cv-06004, 2024 WL 3993162
(W.D. Wash. Aug. 29, 2024) ........................................................... 31, 38

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ....................................................................................19

**Statutes & Other Authorities:**

8 CA ADC § 3205(c)(10) ...........................................................................36

28 U.S.C. § 1291 ..........................................................................................2

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (May 15, 2023)...........................28

Fed. R. Civ. P. 56(a).....................................................................................15

Gov. Code § 12940(l)(1) ..............................................................................30

UnitedHealth Group 2023 10-K.....................................................................5

# I. INTRODUCTION

In the fall of 2021, amid a deadly global pandemic and the rapid spread of the Delta variant, Optum, Inc. ("Optum") implemented a COVID-19 Vaccination Policy ("Vaccination Policy") to protect the health and safety of its patients, employees, and the broader community. ER-203 at ¶15. As part of a healthcare system serving millions of patients—many of whom are immunocompromised or otherwise vulnerable—Optum required in-person employees to be vaccinated or obtain an approved medical or religious exemption. ER-204-205 at ¶ 17.

Appellant Maria Ledezma ("Ledezma"), a pharmacist working onsite at one of Optum's clinical infusion pharmacies, submitted an exemption request copied from the internet the night before it was due—containing generic anti-vaccine rhetoric she later admitted under oath did not reflect her own beliefs. ER-161-165 (Tr. 113:24–117:19). When asked under oath to explain her actual beliefs, Ledezma testified that she objected to the vaccine not on religious grounds, but based on personal health preferences, a belief in homeopathy, and "bodily autonomy." ER-154-155 (Tr. 106:19–107:24). She admits she never communicated those personal beliefs to Optum. ER-165-167 (Tr. 117:11–19).

After considering her role, work location, and safety risks to coworkers and patients, Optum denied the exemption and terminated her employment for noncompliance with its Vaccination Policy. ER-180-181, 184.

The United States District Court for the Northern District of California ("District Court") granted summary judgment to Optum on her sole FEHA claim for failure to accommodate a religious belief. ER-10. The Court reasoned that Ledezma had not shown a *religious* objection to COVID-19 vaccination as a matter of law. *Id*. Ledezma now appeals that judgment. ER-49.

This Court should affirm the grant of summary judgment because Ledezma cannot establish: a *religious* objection to COVID-19 vaccination; a conflict with Optum's Vaccination Policy; or that she ever notified Optum of any sincerely held religious objection, as a matter of law. Alternatively, even if Ledezma could meet the prima facie elements of her FEHA religious accommodation claim (she cannot), this Court should still affirm summary judgment because her requested accommodation—working onsite unvaccinated during a public health emergency—would have imposed an undue hardship on Optum. ER-197 at ¶ 7.

## II. JURISDICTIONAL STATEMENT

The District Court entered final judgment on February 3, 2025. ER-9. Ledezma filed her notice of appeal the same day. ER-5-8. This Court has jurisdiction under 28 U.S.C. § 1291.

## III. ISSUES PRESENTED

1. Did the District Court correctly grant summary judgment on Ledezma's claim under FEHA for failure to accommodate, where, as a matter of law:

   a. Ledezma failed to demonstrate that her objection to the COVID-19 vaccine was based on a bona fide religious belief;

   b. She failed to show an actual conflict between her belief and Optum's Vaccination Policy; and

   c. She did not inform Optum of any sincere religious conflict?

2. Alternatively, should summary judgment be affirmed on the grounds that granting Ledezma an exemption from Optum's Vaccination Policy – allowing her to work onsite unvaccinated during a global pandemic – have imposed an undue hardship, as a matter of law?

## IV. STATEMENT OF THE CASE

### A. Ledezma's Employment with Optum

Ledezma began working as a pharmacist at Optum's clinical infusion pharmacy in Rohnert Park, California, on June 25, 2013. ER-140. The pharmacy specialized in preparing intravenous and subcutaneous medications for patients recently discharged from hospitals. ER-196 at ¶ 4. In this role, Ledezma was responsible for preparing infusion treatments and directly supervising other employees who assisted in the preparation of these treatments. *Id.* This included

retrieving the drug or biological compound from pharmacy storage, measuring the appropriate dosage based on the patient's needs, preparing the drug or compound for delivery, packing it with any necessary supplies, and arranging for the package to be delivered to the patient. *Id.* While most infusion medications were shipped or picked up by a specialized courier for direct delivery to the patient, there were also occasions when infusion nurses or patients themselves picked up the medications directly at the pharmacy. *Id.*

Throughout her employment—including during the COVID-19 pandemic—Ledezma regularly interacted in person with coworkers. ER-148. Approximately six employees, including Ledezma, worked in person at the Rohnert Park facility. *Id.* Most employees shared an open cubicle area; only one person (not Ledezma) had a private office. ER-153. Ledezma testified at her deposition that during the pandemic she brought her own mask to work, describing it as "just any mask," and later admitted that it was made of paper. ER-152-153 (Tr. 93:24–94:21).

Staffing shortages caused by a COVID-19 outbreak at the Rohnert Park pharmacy were likely to cause severe disruptions to pharmacy operations and prevent patients from timely receiving necessary medication. ER-196-197 at ¶¶ 4-7.

### B. Optum Implemented a COVID-19 Vaccination Policy in Response to the COVID-19 Pandemic

Optum is an information and technology-enabled health services business serving the broad health care marketplace and is part of a health care and well-being company with a mission to help people live healthier lives and help make the health system work better for everyone.[1]

Optum and its parent company, UnitedHealth Group Incorporated ("UHG"), and sister company, United Healthcare Services, Inc., began to closely track COVID-19 in January 2020. ER-199 at ¶ 5.[2] It had a large amount of data about the pandemic which it collected, analyzed, and shared with the media, the Centers for Disease Control, the World Health Organization and other governmental and non-governmental organizations. *Id.* Top experts in epidemiology quickly realized that COVID-19 would become a global public health emergency. ER-200 at ¶ 6. An internal steering committee comprised of medical providers, scientists, and epidemiologists guided Optum and UHG's response to the pandemic (the "Steering

---

[1] UnitedHealth Group 2023 10-K, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2023/UNH-Q4-2023-Form-10-K.pdf

[2] Review of COVID-19 data and decisions regarding COVID-19 policies and procedures, including the COVID-19 Vaccination Policy, were conducted at an enterprise level for all entities in the UHG family of companies, including its major subsidiaries, Optum and United HealthCare Services, Inc. References to Optum's policies herein are to UHG policies used across the UHG family of companies.

Committee"). *Id.* This Steering Committee analyzed the most recent developments in the pandemic, the current data on transmission rates, the scientific analysis, guidance from state and federal governments, and recommendations from medical providers, scientists, and epidemiologists to create and update robust policies. *Id.* The goal in developing these policies was to ensure the safety of patients—including many high-risk patients who were elderly, severely ill, immunocompromised, or had other risk factors that made them especially vulnerable to death or serious illness from COVID-19—as well as the safety of employees while they were on Optum property or engaged in Optum business. *Id.* at ¶ 5–9.

As conditions changed over the course of the pandemic, this Steering Committee updated Optum's policies to implement appropriate and necessary safety measures, such as requiring the use of personal protective equipment ("PPE"), testing, temperature checks, self-reporting illness or symptoms, social distancing when possible, and hygiene protocols (including hand hygiene, environmental disinfection, and room air changes). *Id.* at ¶ 9.

Beginning in the second half of July 2021, the Delta variant became the predominant strain of new COVID-19 cases in the United States and, as a result, the number of COVID-19 cases shot dramatically upward. ER-201 at ¶ 12–13. Between June and September 2021, COVID-19 cases rose from 1.8% to over 11%,

hospital admissions were up 600% and, near the peak of the Delta surge, the weekly death toll exceeded 15,000 Americans. *Id.* At that time, the death toll measured from the beginning of the pandemic was approximately 800,000 lives lost in the United States alone. *Id.*

In the fall of 2021, with vaccines then widely available and the deadly pandemic still raging, the Steering Committee, relying on then-available scientific data, determined that COVID-19 vaccines were effective in preventing COVID-19 disease and were very effective at preventing severe COVID-19 disease and COVID-19 deaths. ER-203 at ¶ 15. It further determined that vaccination reduced the risk of workplace and community transmission of COVID-19 and protected vulnerable individuals who were ineligible for or nonresponsive to the vaccine. *Id.* Scientific data at the time showed that, even if a vaccinated individual became infected, they were at least 50% less likely to transmit the infection as compared to unvaccinated people. *Id.*

The Steering Committee also determined that nonpharmaceutical interventions, such as masking, testing, symptom monitoring, and physical distancing, were not sufficient to control pandemic spread of COVID-19. ER-203-204 at ¶ 16. Even with the pre-existing masking requirements, there were many reports of employees who would not wear masks at all, who would regularly

remove their masks while at work, who would improperly wear their masks or who would wear improper masks (*i.e.*, paper masks as opposed to N95 masks). *Id.*

In addition, the only available tests in 2021 required people to travel to a testing site and then wait several days for their results. *Id.* This waiting period could lead to staffing shortages. Plus, there was no satisfactory cadence of testing that Optum determined would have solved this problem. *Id.* Testing once per week would have missed infections that arose on the other 6 days, while testing daily would have been unduly onerous and impractical, particularly given the lag time in obtaining results and the burden on employees. *Id.* Further, testing can convey to healthcare workers a false sense of safety that could have led to lapses in other safety measures. *Id.* Moreover, testing was expensive, with estimates ranging from $75,000–$370,000 per week for a few thousand employees in California, plus the costs of directing employees to travel to the test site. *Id.* Monitoring and self-reporting symptoms was also not sufficiently safe; approximately 40 to 50% of COVID-19 infections were asymptomatic, with asymptomatic individuals shedding virus for at least 7 days. *Id.*

Finally, social distancing was not sufficient because there was no way to ensure employees remained distanced, especially when they worked indoors. *Id.* Many employees congregated in break rooms despite Optum's social distancing requirements. *Id.* In short, even though Optum implemented all of these

nonpharmaceutical interventions prior to initiating the Vaccination Policy, outbreaks of COVID-19 at worksites continued to occur. *Id.*

Accordingly, around October 2021, Optum announced a seventh version of the COVID-19 Vaccination Policy that applied to any employee who: a) provided in-person care to patients in a facility or an at-home setting; b) met face-to-face with customers, members, providers, or suppliers; and/or c) entered any Optum facility (whether on a full-time, part-time, or occasional basis). ER-204-205, 208 at ¶17, Ex. A. The policy required employees who met one or more of these criteria to become fully vaccinated by November 15, 2021 or to request and be approved for a religious or medical exemption. *Id*.

Optum carefully considered employee requests for exemptions and provided reasonable accommodation for religious requests when it could do so without undue hardship to its business. ER-205 at ¶ 18.

### C. Ledezma's Religious Exemption Request

On or around September 10, 2021—just one day before her exemption request was due—Ledezma submitted to Optum a request for religious exemption from the company's COVID-19 Vaccination Policy. She had copied the document nearly verbatim from an internet form widely circulated on anti-vaccine websites at the time. ER-162-165 (Tr. 114:2-117:19), 177-178. Ledezma admitted at deposition that she found the two-page document online, deleted a few portions,

and submitted the rest, unchanged, to Optum. ER-162-166 (Tr. 114:2-117:19). She was unable to identify any language in the submission that she personally drafted. *Id*.

The internet form claimed her exemption request was "based on my deeply held religious beliefs pursuant to my reliance on teachings in the Holy Bible." ER-177-178. However, the internet form went on to list a series of secular, non-religious objections to the COVID-19 vaccine, including:

- That COVID-19 "has a survivability rate of 99.98%;"
- That "I have the legal right to be exempted from the vaccine mandate based on [the] Federal Food, Drug, and Cosmetic Act;"
- That some COVID-19 vaccines are "merely authorized, not approved or licensed" by the federal government;
- That a Federal Court "held that the U.S. military could not mandate EUA vaccines to soldiers;"
- That "young women are concerned that this vaccine may impact their ability to have children or affect an unborn child;"
- That "COVID-19 shots work as gene therapy" and "alter what God made;"
- That the vaccines "contain carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals;" and
- That "I believe they may be harmful to my body."

*Id.*

### D. Ledezma's Actual Alleged Objection to the COVID-19 Vaccine

At deposition, when Ledezma was asked to describe the basis for her objection to the COVID-19 vaccine, she conceded under oath that she actually held an entirely different set of beliefs from those she had submitted to Optum in her exemption request. ER-154-155 (Tr. 106:19–107:24). In fact, she testified that she did not hold any of the beliefs listed on the internet form she had submitted to Optum. *Id.*

When asked at deposition to describe her actual beliefs against COVID-19 vaccination, Ledezma testified under oath:

> your body is the temple of the holy spirit and you have to take care of it. I come from a tradition in Mexico where we use a lot of holistic treatments prior to going to allopathic or Western treatments. So especially after I worked at the homeopathic pharmacy, I learned that I can take care of my body and in a more holistic way without having to introduce foreign substances and chemicals. And so to me, it's -- it's the autonomy of your body and what you do with your body and, you know, you have to take care of your body. This is -- this is sacred, and you try to lessen the harm that you do with anything, with anything that you introduce, any allopathic treatments or medications. Since I learned and studied homeopathy, I know that I can treat myself using that methodology, which is the holistic way of treating myself. So you have to -- our church teaches us self-autonomy, bodily autonomy so you take care of your temple to the best of your ability.

ER-154-155 (Tr. 106:19–107:24).

### E. Optum's Denial of Ledezma's Exemption Request

On or around November 11, 2021, Optum informed Ledezma that it had considered her request for a religious exemption but was unable to grant it. ER-

180-181. For purposes of its internal review only, Optum did not challenge "the sincerity of [Ledezma's] religious beliefs and [her] explanation of why those beliefs prevented [her] from getting vaccinated." ER-184. Optum conducted an individualized assessment of various factors, including Ledezma's "work location, [her] role, the nature of [her] work, and patient and employee safety." *Id.*

Ultimately, Optum determined that "in [Ledezma's] role as a Pharmacist, it is not possible for [her] to never go into the branch or to have a physical presence there," which was "consistent with how [Optum] evaluated other pharmacy roles like [Ledezma's] across the infusion organization." *Id.* Ledezma admits that she needed to work in-person at the branch, and so was essentially requesting to work onsite unvaccinated. ER-170-171 (Tr. 126:15-127:4 ["Q. you agreed with the statement that in your role as a pharmacist, it's not possible to never go into the branch, but your position was that I should be able to still go into the branch even though I'm not vaccinated…? A. Correct …."]).

On November 29, 2021, Ledezma submitted a second letter "to appeal the religious exemption denial." ER-192-193. In this second letter, Ledezma admitted that she had contact with other employees, that there was a time in 2021 when at least three of her coworkers tested positive, and that she worked in-person at the pharmacy. ER-192-193.

Optum explained to Ledezma that it would be an undue hardship to allow her to remain unvaccinated and "come into a facility or interact with other staff or individuals on behalf of [Optum]." ER-184, 187-188.

### F. Ledezma's Separation from Employment

Ledezma chose not to vaccinate, was placed on administrative leave, and her employment was terminated for non-compliance with Optum's COVID-19 Vaccination Policy. ER-171.

### G. Procedural History

Ledezma filed her Complaint in the Sonoma County Superior Court on November 13, 2023, alleging two causes of action: (1) failure to provide reasonable accommodation under FEHA; and (2) violation of Title VII of the Civil Rights Act of 1964 for failure to accommodate on the basis of religion. The case was removed to the District Court on December 29, 2023. ER-244.

On January 5, 2024, Optum filed a Motion to Dismiss Plaintiff's Title VII Claim, because it was filed more than 90 days after she received a right to sue notice from the EEOC. Ledezma filed a First Amended Complaint on February 23, 2024, removing the Title VII claim. ER-244. On March 8, 2024, Optum filed its Answer to the First Amended Complaint. ER-244.

On December 12, 2024, Optum filed a Motion for Summary Judgment. ER-246. On January 16, 2025, oral argument was heard on Optum's Motion for

Summary Judgment. On January 29, 2025, the District Court properly granted Optum summary judgment, finding "the evidence insufficient to establish a genuine issue of material fact on whether Ledezma's belief as to the vaccine is religious in nature." ER-10. The Judgment was signed on February 3, 2025. ER-247.

On January 29, 2025, Ledezma filed a Notice of Appeal. ER-247.

## V. SUMMARY OF THE ARGUMENT

The District Court properly granted summary judgment in Optum's favor because Ledezma failed to establish a key element of her prima facie case: she was unable to show that her objection to vaccination was religious in nature. In fact, she conceded under oath that her objection to COVID-19 vaccination was based on her personal preferences for homeopathy and "body autonomy"—views that are not protected under FEHA. ER-154-155 (Tr. 106:19–107:24).

Ledezma is also unable to establish a prima facie case for two other reasons: (1) she failed to show any actual conflict between her stated beliefs and the Vaccination Policy; and (2) she never informed Optum of any sincere religious conflict with the Vaccination Policy. She conceded under oath that the exemption request she submitted to Optum, the night before the deadline, was copied from an anti-vaccine website and did not reflect her own actual views. ER-161-165 (Tr. 113:24–117:19).

Even assuming arguendo that Ledezma could establish a prima facie case, summary judgment is still warranted because accommodating her request to work unvaccinated — in a pharmacy where she prepared critical, time-sensitive medications for high-risk patients alongside at least five coworkers — would have imposed an undue hardship. ER-184, 187-188. Although the District Court did not need to reach this issue, it provides an alternative ground to affirm on *de novo* review. ER-49.

The Court should affirm summary judgment for Optum.

## VI. STANDARD OF REVIEW

The Court reviews a District Court's grant of summary judgment *de novo. Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008).

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). To avoid summary judgment, the nonmovant must present specific, admissible evidence showing a triable issue—not speculation, attorney argument, or a mere scintilla. *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010); *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897–98 (9th Cir. 2021).

## VII. ARGUMENT

### A. Ledezma Cannot Establish a Prima Facie Case as a Matter of Law

To prevail on her claim, Ledezma must establish a prima facie case by showing: (1) she held a sincere religious belief that conflicted with Optum's COVID-19 Vaccination Policy; (2) she informed Optum of the belief and the conflict; and (3) she was discharged for failing to comply with the policy. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). Under FEHA, an employee pursuing a failure-to-accommodate claim must specifically inform the employer of her actual religious belief and explain how it conflicts with a job requirement. *Id*. Even if a plaintiff meets these initial requirements, the employer can still prevail by showing that accommodating the request would impose an undue hardship. *Id*.[3]

Here, Ledezma cannot show that she had a *religious* objection to Optum's Vaccination Policy, that any actual conflict existed between her beliefs and the

[3] The elements of a failure to accommodate claim under FEHA are identical to a Title VII failure to accommodate claim. *See Crawford v. Trader Joe's Co.*, No. EDCV211519JGBSHKX, 2023 WL 3559331, at *8 (C.D. Cal. May 4, 2023). "Courts look to federal interpretations of discrimination law when interpreting the provisions of FEHA." *Sequeira v. Alameda Cnty.*, No. C 06-01413 MEJ, 2008 WL 5179108, at *4 (N.D. Cal. Dec. 10, 2008) (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996)).

policy, or that she ever communicated any such sincere religious conflict to Optum.[4]

### 1. Ledezma's objection to vaccines is not religious as a matter of law

To establish the first element of her prima facie claim for religious discrimination under FEHA, Ledezma must demonstrate that her belief is religious in nature. *See Doe v. San Diego Unified Sch. Dist*., 19 F.4th 1173, 1180 (9th Cir. 2021) ("an employee's request for an exemption from a COVID-19 vaccination mandate can be denied on the ground that the employee's belief is not truly religious in nature"). As a matter of law, Ledezma cannot make this showing.[5]

This Court applies the framework originally articulated in *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981), as "useful

---

[4] Ledezma's reliance on *Keene v. City and County of San Francisco*, No. 22-16567 (9th Cir. 2023) (unpublished memorandum disposition) is misplaced. See Opening Brief at 7. Not only is Keene non-precedential, but it involved a motion for preliminary injunction—not summary judgment—and the Ninth Circuit explicitly noted the record was underdeveloped, particularly regarding the employer's defenses. Here, by contrast, the District Court granted summary judgment based on a fully developed evidentiary record. *Keene* does not alter the applicable legal standard and has no bearing on the outcome of this case.

[5] Ledezma misstates controlling Ninth Circuit precedent, arguing that *Bolden-Hardge v. Office of the California State Controller,* 63 F.4th 1215 (9th Cir. 2023), holds that Courts may not question the validity of an asserted belief. *See* AOB at 7. But that is not what the District Court did—and not what Optum argues here. *Bolden-Hardge* permits Courts to assess whether a belief is *religious* in nature and whether a conflict exists between the belief and a job requirement. *Id.* at 1223.

guidance" to determine whether a belief qualifies as religious. *See Stephens v. Legacy-GoHealth Urgent Care*, No. 3:23-CV-00206-SB, 2023 WL 7612395, at *5-9 (D. Or. Oct. 23, 2023), *report and recommendation adopted sub nom.*, 2023 WL 7623865 (D. Or. Nov. 14, 2023) (using the *Africa* "guideposts" to determine that the plaintiff failed adequately to plead that her anti-vaccination beliefs were religious in nature for purposes of her claims under Title VII).

"Courts in the Ninth Circuit use three 'guideline' factors [from *Africa*] to help determine if a given belief constitutes a 'religion,' for FEHA purposes." *Dunbar v. Twentieth Century Fox Television*, No. CV 22-1075-DMG (JCX), 2024 WL 2107712, at *6 (C.D. Cal. Mar. 8, 2024), *motion to certify appeal denied*, 2025 WL 576584 (C.D. Cal. Feb. 10, 2025), *citing Friedman v. S. Cal. Permanente Med. Grp.*, 102 Cal. App. 4th 39, 69 (2002).[6] Specifically, under the *Africa* framework, Courts evaluate whether a belief system: (1) addresses fundamental and ultimate questions involving deep and imponderable matters; (2) is comprehensive in nature, rather than an isolated idea or teaching; and (3) is marked

[6] Many recent District Court decisions in the Ninth Circuit have applied the *Africa* factors in determining whether a plaintiff's beliefs are religious in nature for purposes of Title VII and/or FEHA. *See, e.g., Medrano v. Kaiser Permanente,* No. 8:23-CV-02501-DOC-ADSX, 2024 WL 3383704, at *3 (C.D. Cal. July 10, 2024); *Cruz v. Kaiser Found. Hosps.*, No. CV 23-00630 LEK-RT, 2025 WL 951099, at *4 (D. Haw. Mar. 28, 2025); *Ashcroft v. S. Cal. Permanente Med. Grp.*, No. 24-CV-0035-MMA-MMP, 2025 WL 268387, at *4 (S.D. Cal. Jan. 22, 2025).

by certain formal and external signs commonly associated with religion. *Africa*, 662 F.2d at 1032.[7]

As explained in *Africa*, these distinctions are necessary to ensure that individuals do not claim a "blanket privilege 'to make [their] own standards on matters of conduct in which society as a whole has important interests.'" *Id*. at 1031 (quoting *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). Accordingly, beliefs rooted in social, political, or economic views; personal preferences; or other nonreligious concerns—including objections grounded in vaccine safety—are not protected under the law. See *EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, at L.2 (Oct. 25, 2021); see also *Chavez v. San Francisco Bay Area Rapid Transit Dist*., 2024 WL 332881, at *4 (N.D. Cal. Jan. 28, 2024)(quoting EEOC guidance); *Tiano v. Dillard Dept.*

[7] Ledezma's reliance on *United States v. Seeger*, 380 U.S. 163 (1965); *Welsh v. United States*, 398 U.S. 333 (1970); and *Thomas v. Review Board*, 450 U.S. 707 (1981) in her Opening Brief underscores the weakness of her position. *See* AOB at 5, 7–8. These cases arose under the Selective Service Act and involved conscientious objector status—not religious accommodation in employment—and thus provide no guidance under Title VII or FEHA. While *Thomas* has been cited for the principle that Courts may not question the truth of religious beliefs, that principle does not resolve whether a belief is religious in the first place, which is the issue here. Ledezma's reliance on *Doe v. San Diego Unified School District,* 19 F.4th 1173 (9th Cir. 2021), and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), is similarly misplaced. These were constitutional Free Exercise challenges, not an accommodation claim against a private employer. *See* AOB at 6.

*Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998) (noting that employers need not "accommodate the personal preferences of the employee" because "Title VII does not protect secular preferences"); *Green v. S. Lane Sch. Dist.*, No. 6:23-CV-01630-MC, 2025 WL 691313, at *3 (D. Or. Mar. 4, 2025) ("Title VII . . . does not protect secular preferences").

The District Court correctly granted summary judgment in Optum's favor, holding Ledezma failed to raise a genuine issue of material fact as to whether her beliefs about the vaccine were religious in nature. ER-10. The Court explained that "Ledezma's practice of protecting the temple of her body by not introducing harmful substances is at its core a secular belief…" *Id*. (citations omitted). The Court held that "the source of her belief on the safety and foreign nature of the vaccine is her right to self-autonomy." *Id*. It rightly held that "Ledezma's interpretation of the Bible to grant her full authority to decide what she should and shouldn't do to her body is the type of 'blanket privilege' that does not suffice as a bona fide religious belief." *Id*. (citations omitted). This Court should affirm these well-reasoned holdings.

#### a. Ledezma's own sworn testimony demonstrates that her objection to the COVID-19 vaccination fails the *Africa* test and is secular, not religious, in nature

Ledezma's own sworn testimony confirms that her objection to the COVID-19 vaccination does not satisfy any of the three *Africa* factors, which assess

whether a belief qualifies as "religious" under the law. Specifically, Ledezma testified that her objection arises from her belief that her "body is the temple of the Holy Spirit" and that she seeks to avoid "foreign substances and chemicals" in favor of holistic treatments. ER-154-155 (Tr. 106:19–107:24). She further explained that her belief centers on "autonomy of your body" and the need to "lessen the harm" caused by what one introduces into the body. *Id*. Importantly, she conceded that she alone decides what is and is not permissible based on her personal interpretation of scripture. ER-160 (Tr. 112:12–24 ["you have autonomy over your body and you are to decide what's good for you and what's not for you . . . it's just having the self-autonomy and deciding on what's best for you and what's not best for you"]). As she put it: "Our church teaches us self-autonomy, bodily autonomy so you take care of your temple to the best of your ability." ER-155 (Tr. 107:21-24).

These views reflect personal health preferences and beliefs about individual autonomy, not religious beliefs. They do not address the kind of "fundamental and ultimate questions having to do with deep and imponderable matters" contemplated by *Africa*, such as the existence of a deity or the nature of the soul. *See Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981). Instead, they concern a narrow issue—personal autonomy in health choices. Nor are Ledezma's

views part of a comprehensive belief system; they represent an isolated health practice.

Ledezma's beliefs also lack the formal and external signs commonly associated with religion, the third *Africa* factor. She identifies no religious rituals, practices, clergy guidance, or organizational affiliation that formally support or define her anti-vaccination stance. Courts applying the *Africa* framework consistently find that personal or ad hoc interpretations, absent recognized religious structure or external markers, fail to meet this threshold. *See Africa*, 662 F.2d at 1032; *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa*., 877 F.3d 487, 492 (3d Cir. 2017). Ledezma's individual, self-guided interpretation lacks any such formal religious features and thus further undermines her claim. Under each of the *Africa* factors, her belief is not religious and therefore is not protected under FEHA.

Courts have routinely rejected claims premised on personal health choices or generalized religious references—particularly those asserting that the body is a "temple" or invoking spiritual autonomy to oppose vaccination. For example, in *Bowie v. Kaiser Found. Health Plan Inc*., 2024 WL 3872926, at *1 (N.D. Cal. Aug. 16, 2024), the Court held that a belief that "the body is the temple of the Holy Spirit" was insufficient to establish a religious objection to the COVID-19 vaccine. Similarly, in *Fallon,* 877 F.3d at 492, the Court rejected the claim that a belief in avoiding harm to one's body based on distrust of the flu vaccine qualified as

religious under Title VII. And in *Ellison v. Inova Health Care Servs*., 692 F. Supp. 3d 548, 557–58 (E.D. Va. 2023), the Court dismissed claims by three employees who asserted similar "body is a temple" beliefs, holding that they were based on personal health concerns and vaccine safety—not religious doctrine or comprehensive religious belief systems—thus failing the *Africa* test.

As these authorities demonstrate, merely citing religious language or scriptural references does not transform a personal or secular objection into a religious belief. *See Ulrich v. Lancaster Gen. Health*, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023); *Glasner v. AvalonBay Communities, Inc*., 2024 WL 1600644, at *3–4 (C.D. Cal. Mar. 15, 2024); *Medrano v. Kaiser Permanente*, No. 8:23-cv-02501-DOC-ADSx, 2024 WL 4432788, at *4 (C.D. Cal. Sept. 30, 2024) (appeal filed Oct. 16, 2024).

#### b. Ledezma's admissions demonstrate that her beliefs amount to an impermissible "blanket privilege" as a matter of law

Ledezma's beliefs are also not religious because her own admissions confirm that they amount to an impermissible "blanket privilege"—the kind of open-ended, subjective framework that Courts have consistently rejected as a matter of law. Unlike plaintiffs who claim divine guidance or adherence to fixed religious doctrine, Ledezma conceded that she alone decides what is and is not permissible. ER-160 (Tr. 112:12–24 ["you have autonomy over your body and you

are to decide what's good for you and what's not for you . . . it's just having the self-autonomy and deciding on what's best for you and what's not best for you"]). She testified: "Our church teaches us self-autonomy, bodily autonomy so you take care of your temple to the best of your ability." ER-155 (Tr. 107:21-24). She emphasized that she alone, not any religious authority or divine mandate, determines what conduct aligns with those principles.

This highly individualized, discretionary framework is precisely what Courts have described as a "blanket privilege"—a limitless personal exemption untethered from objective religious mandates. Courts have consistently rejected such claims, holding that they do not suffice to establish a bona fide religious belief under the law. *See Fallon*, 877 F.3d at 492 (rejecting subjective, personal health objections as impermissible blanket privilege); *Ellison*, 692 F. Supp. 3d at 559 (rejecting claim that employee could personally determine when God approved vaccination as blanket privilege under *Africa*); *Weiss v. Permanente Med. Grp., Inc.*, 738 F. Supp. 3d 1217, 1221–23 (N.D. Cal. 2024) (rejecting belief against "foreign substances" as the kind of blanket privilege that would create limitless excuses for avoiding obligations).

Moreover, Ledezma identified no limiting principle. She testified that her personal autonomy around "health" shapes not only her views on vaccination, but also her decisions about what products to use, what television shows to watch,

what she puts on her body, and even what information she chooses to consume. ER-155-157 (Tr. 107:25–109:15). For example, she explained that she avoids learning about COVID-19 death statistics because "I try to avoid a lot of the information because I just don't think it's healthy." ER-174 (TR. 143:14-17). These examples confirm that her belief system centers on self-directed lifestyle choices—not religious mandates—and thus cannot support a religious accommodation claim.

Given the uncontroverted nature of Ledezma's testimony and the weight of legal authority, her beliefs are not religious as a matter of law. Summary judgment was properly granted on this basis.

### 2. Ledezma cannot show any conflict between her beliefs and COVID-19 vaccination

Though the District Court did not need to reach this issue, an independent ground on which this Court should affirm summary judgment is that Ledezma cannot demonstrate a conflict between her alleged beliefs and Optum's COVID-19 Vaccination Policy. "It is the responsibility of the employee to inform their employer of a conflict arising between the employer's policies and the employee's professed religious beliefs." *Mullen v. AstraZeneca Pharms., LP,* No. CV-03903, 2023 WL 8651411, at *3 (E.D. Pa. Dec. 14, 2023) (emphasis added) (citing *Geraci v. Moody-Tottrup, Intern., Inc*., 82 F.3d 578, 581 (3d Cir. 1996)). "A defendant

employer is not required to offer an accommodation in the absence of a conflict." *Id.*

Ledezma testified that she believes her "body is the temple of the holy spirit," and that it is sacred "to lessen the harm that you do with anything, with anything that you introduce, any allopathic treatments or medications." ER-154-155 (Tr. 106:19–107:24). But she admitted that she did not actually know whether the COVID-19 vaccine would cause her harm. ER-172-173 (Tr. 140:13–141:14) ("Q. Did you believe or do you believe that the COVID-19 vaccine would cause you medical harm? A. I really wasn't sure."). She conceded under oath: "So to me, it was just declining another vaccine. It wasn't that this was a special one. It was just another vaccine that I was declining like I had done for the previous eight years." ER-158-160 (Tr. 110:23–112:10).

Ledezma cannot explain how her beliefs actually conflicted with Optum's COVID-19 Vaccination Policy. Despite multiple opportunities during deposition and discovery, she never articulated any religious tenet that prohibited the vaccine. As in *Berna v. Bayhealth Med. Ctr., Inc.*, No. 23-cv-945-RGA, 2024 WL 456420, at *6 (D. Del. Feb. 5, 2024), Ledezma provided "no information regarding how this 'Body is a Temple' belief prohibits her from receiving COVID-19 vaccine."

Because Ledezma admitted she was unsure whether the vaccine would cause harm, and because she failed to identify any religious tenet that required her to

refuse it, she cannot show a genuine conflict as a matter of law. As the court held in *Mullen*, "[i]t remains that the Plaintiff identified no religious belief to the Defendant that prevented [her] taking the vaccine and, thus, Defendant did not violate Title VII by not providing an accommodation." 2023 WL 8651411, at *4.

The fact that Ledezma cannot identify any conflict between her beliefs and the COVID-19 vaccine as a matter of law is an additional basis on which to affirm summary judgment for Optum.

### 3. Ledezma admitted that she did not communicate her actual beliefs against vaccination to Optum

Ledezma cannot establish a prima facie case for a third, independent reason: by her own admission, she never communicated her *actual* beliefs against COVID-19 vaccination to Optum.

An employer cannot be liable under FEHA for failing to accommodate religious beliefs that were never communicated to the employer. *See Oberst v. Cnty. of Lane*, No. 6:23-CV-01556-MC, 2025 WL 318712, at *3 (D. Or. Jan. 28, 2025) (granting defendant's motion for summary judgment on plaintiff's Title VII failure to accommodate claim, in part because "Plaintiff did not inform Defendant of any *religious* conflict with the masking and testing requirements. Plaintiff took issue with that accommodation on purely secular grounds, citing privacy concerns") (emphasis in original); *Medrano v. Kaiser Permanente*,No. 8:23-CV-02501-DOC-ADSX, 2024 WL 3383704, at *2 (C.D. Cal. July 10, 2024) (dismissing plaintiff's

Title VII and FEHA claims on the grounds that "Plaintiff also fails to plausibly plead the second element of her prima facie case because she did not inform her employer of the alleged conflict between the employment duty and religious belief"); *Weiss,* 738 F. Supp. 3d at 1223-25 (granting defendant's motion for judgment on the pleadings, in part because plaintiff failed to plausibly plead that she informed her employer of a conflict between her religious beliefs and the vaccination policy); *see also* EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, at L.2 (May 15, 2023)("An employee who fails to cooperate with an employer's reasonable requests for verification of the sincerity or religious nature of a professed belief, practice, or observance risks losing any subsequent claim that the employer improperly denied an accommodation.")[8]

Ledezma admitted under oath at deposition that the beliefs set forth in the document she submitted to Optum were not her own beliefs, but rather were "just taken off the internet" because her exemption request "was due the next day, so I just went online, looked for something" and "I didn't think much of it. I just

[8] The guidance can be found at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited on May 21, 2025)

thought, well, they need to have some documentation." ER-164-165. (Tr. 116:2–117:19)

When Ledezma was asked under oath to explain the basis for her objection to COVID-19, she did not list any of the beliefs set forth in the document she had previously submitted to support her exemption request. ER-154-155. (Tr. 106:19–107:24) And she admits that the belief she now professes was never shared with Optum at the time she requested an exemption. ER-164-165. (Tr. 116:2–117:19)

A claim for failure to accommodate under FEHA requires that the employee inform her employer of her *actual* belief and the conflict with the job requirement. *See Peterson*, 358 F.3d at 606. Ledezma admitted at deposition that she never shared her own belief with Optum. As a matter of law, Optum cannot be held liable under FEHA for failing to accommodate a belief that was never communicated to it. The fact that Ledezma admitted she did not share her own objections to the COVID-19 vaccine with Optum is an independent basis on which the Court should affirm summary judgment for Optum.

### B. Allowing Ledezma to Enter Optum's Facilities While Unvaccinated Would Have Posed an Undue Hardship as a Matter of Law

Even if Ledezma could establish a prima facie case (she cannot), summary judgment is still warranted because Optum has demonstrated that accommodating her request to remain unvaccinated would have imposed an undue hardship. While

the District Court did not need to reach the undue hardship question, undue hardship is an independent basis on which this Court should affirm summary judgment.

Under FEHA, an employer is not required to accommodate a religious belief if doing so would create an undue hardship. See Gov. Code § 12940(l)(1) (it is a violation "to discharge a person from employment… because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer… is unable to reasonably accommodate the religious belief or observance without undue hardship"); *Tiano*, 139 F.3d at 681 (employer need not accommodate where it "could not reasonably accommodate the employee without undue hardship").

Here, the undisputed record establishes that allowing Ledezma to enter Optum's healthcare facilities while unvaccinated would have posed a risk to employee health and safety. Because Optum has shown that accommodating Ledezma would have imposed an undue hardship, this provides an independent basis to affirm the District Court's judgment.

### 1. Undue Hardship Standard

An accommodation causes an "undue hardship" when the burden "is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). The Supreme Court reiterated the longstanding rule that

"Courts must apply the test in a manner that takes into account all relevant factors in the case at hand," and always return to the question of the "substantial increased costs in relation to the conduct of [an employer's] particular business." *Id*. at 470 (emphasis added); *see also Bordeaux v. Lions Gate Ent., Inc*., 703 F. Supp. 3d 1117, 1135 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("The undue hardship inquiry takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer.").

Federal courts have long recognized that an employer's showing of undue hardship under FEHA and Title VII may include both economic and non-economic burdens — a principle that remains intact after *Groff*. *See Groff,* 600 U.S. at 470–71 (undue hardship inquiry "takes into account all relevant factors … including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer").

Following *Groff*, district courts in this Circuit have continued to apply the principle that non-economic burdens, including health and safety risks, can create an undue hardship. See, e.g., *Bordeaux,* No. 23-4340*,* 2025 WL 655065, at *2 (9th Cir. Feb. 28, 2025)(affirming summary judgment on the grounds that the safety risk an unvaccinated employee posed to coworkers was an undue hardship); *Williams v. Legacy Health*, No. 22-cv-06004, 2024 WL 3993162, at *6–7 (W.D.

Wash. Aug. 29, 2024) (same); *Hailey v. Legacy Health*, No. 3:23-CV-00149-IM, 2024 WL 4253238, at *8–9 (D. Or. Sept. 20, 2024) (same). Similarly, in *MacDonald v. Oregon Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024 WL 3316199, at *7 (D. Or. July 5, 2024), the court confirmed that "it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission, in analyzing undue hardship." *MacDonald* further held that "an employer is permitted to draw conclusions based on evidence and information that was available at the time." *Id*.

#### 2. Optum Determined that Allowing Ledezma to Work Unvaccinated in Optum's Facilities Created an Unacceptable Health and Safety Risk.

When a proposed accommodation would compromise workplace safety, it is generally considered an undue hardship. *See*, *e.g*., *Bordeaux,* 703 F. Supp. 3d at 1135 (C.D. Cal. 2023), aff'd, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) (reviewing the prevalence of COVID-19 at the time of plaintiff's exemption request before reasoning that, "[i]n and of itself, this safety risk constitutes an undue hardship"). This is particularly true where, as here, "the employer's business involves the protection of lives," and courts are rightly reluctant to "restructure its employment practices." *Jean-Pierre v. Naples Cmty. Hosp., Inc*., 817 F. App'x 822, 828 (11th Cir. 2020) (quoting *Beadle v. City of Tampa*, 42 F.3d 633, 636

(11th Cir. 1995)); *see also United States v. City of Albuquerque*, 545 F.2d 110, 111, 114 (10th Cir. 1976).

Like every healthcare provider, Optum is responsible for delivering the highest level of patient care and for protecting all who enter its facilities—employees, contractors, and patients alike—from unreasonable health risks.

Based on the analysis by an internal expert committee of physicians, epidemiologists, and scientists, Optum determined that allowing unvaccinated employees, including pharmacists like Ledezma, to work in person would have posed an undue hardship for three independent reasons: (1) increased risk of exposure to others in the pharmacy; (2) if Ledezma or others tested positive for COVID-19, the pharmacy would experience staffing shortages due to mandatory quarantine requirements, disrupting patient care; and (3) alternative safety measures, such as masking, testing, and symptom tracing, were not adequate substitutes for vaccination.

**a. Increased Risk of Exposure**

In the height of the pandemic, Optum determined that allowing Ledezma to work on-site while unvaccinated would have increased the risk of exposing others in the pharmacy to COVID-19—a potentially fatal disease. ER-206 (Schlaefer Decl. ¶¶ 22–23.) At the relevant time, Optum relied on data showing that: (1) available vaccines were effective in preventing COVID-19; (2) vaccination

significantly reduced the risk of workplace transmission and protected vulnerable populations; and (3) even if vaccinated individuals contracted COVID-19, they were at least 50% less likely to transmit the virus. ER-201-205 (Id. ¶¶ 10–17.) Thus, the risk of substantial bodily harm or death to patients and coworkers was not merely hypothetical—it was real. Courts have repeatedly held that such risks constitute an undue hardship under Title VII. *See, e.g., Bordeaux,* 2025 WL 655065, at *2, *Bushra v. Main Line Health, Inc*., 2025 WL 1078135, at *2; *Hailey*, 2024 WL 4253238, at *14; *Antredu v. Mass. Dep't of Youth Servs*., 729 F. Supp. 3d 76, 84 (D. Mass. 2024).

This Court in *Bordeaux* recently affirmed summary judgment for the employer in a COVID-19 vaccination case where the employer demonstrated that accommodating an unvaccinated employee would have created safety risks and potential disruptions. *Bordeaux*, 2025 WL 655065, at *2. This Court rejected the argument that such risks were too speculative and emphasized that "an employer need not establish that an adverse health or safety event is certain to result from an accommodation to establish undue hardship under Title VII." *Id.* Similar to Ledezma, whose role at Optum's clinical infusion pharmacy involved face-to-face contact with coworkers, "[t]he nature of Plaintiff's work [in *Bordeaux*] required close, unmasked contact with other performers on [the production set] and, potentially, members of the crew." *Bordeaux,* 703 F. Supp. 3d at 1134-35. Given

that, at the time of filming in *Bordeaux*, "roughly 2,000 deaths per day were attributable to COVID-19," the District Court reasoned that "[a]ccommodating Plaintiff's exemption request would have put the lives of her fellow cast and crew members in danger." *Id*. at 1135. The district court also emphasized that "[n]umerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Id*. at 1136. In affirming summary judgment for the employer, this Court agreed with the lower court's reasoning and concluded that, in light of the "prevalence of COVID-19" during the relevant time period, "the risk of Bordeaux coming into 'close contact' with an individual testing positive was a real, not a hypothetical, risk." *Bordeaux*, No. 23-4340, 2025 WL 655065, at *2 (9th Cir. Feb. 28, 2025). The undisputed evidence shows that the very same risk existed here.

The First Circuit has reached the same conclusion. In *Rodrique v. Hearst Commc'ns, Inc*., 126 F.4th 85 (1st Cir. 2025), the Court upheld summary judgment for the employer, holding that the employer's reliance on prevailing medical and public health guidance in requiring vaccination was sufficient to establish undue hardship; the employer was not required independently to prove vaccine efficacy against transmission. Likewise, in *Melino v. Boston Medical Center*, 127 F.4th 391, 397–98 (1st Cir. 2025), the court affirmed summary judgment where

uncontroverted CDC guidance demonstrated that exempting the employee from the vaccination requirement would have imposed an undue hardship on the employer. These rulings, consistent with this Court's approach in *Bordeaux,* reinforce that Optum's reliance on expert consensus and public health data in this case fully satisfies the applicable legal standard.

#### b. Staffing Shortages if Ledezma or Coworkers Tested Positive for COVID-19

The undisputed record shows that if Ledezma or any of her coworkers contracted COVID-19, mandatory quarantine rules would have forced them to miss at least ten days of work—causing severe staffing shortages and disrupting patient care. ER-196-197 at ¶¶ 4–7; ER 105-206 at ¶¶ 19–21; see also 8 CA ADC § 3205(c)(10) (Version 1). Infusion medications are time-sensitive, must be stored under precise conditions, and are often the only treatment available to patients who depend on timely administration. ER-196-197 at ¶¶ 4–7. Optum reasonably determined that a COVID-19 outbreak among pharmacists—such as the one that occurred at Ledezma's pharmacy prior to vaccinations being available – would have jeopardized patient health and left the pharmacy short-staffed. ER-197 at ¶ 7. Ledezma herself admitted, during her worksite's previous outbreak, four out of six pharmacy employees became ill and were required to take leave. ER-192.

Courts have recognized that the risk of staffing shortages constitutes an undue hardship. For example, in *Bordeaux,* 703 F. Supp. at 1135, the Court held

that accommodating an unvaccinated employee would have caused unacceptable operational burdens, including staff absences due to required quarantine and potential shutdown of critical services. Similarly, in *Howe v. Massachusetts Dep't of Correction*, No. 4:22-CV-40119-MRG, 2024 WL 3536830, at *5–6 (D. Mass. July 25, 2024), the Court held that the risk of staffing shortages in a correctional facility—where available staff were already stretched thin—constituted an undue hardship. *See also Mullen v. AstraZeneca Pharms*., LP, No. CV-03903, 2023 WL 8651411, at *5 (E.D. Pa. Dec. 14, 2023) (recognizing that the potential absence of key employees due to COVID-19 exposure or quarantine justified an undue hardship finding).

Courts have also made clear that the employer's duty is not limited to safety risks alone but includes health risks and staffing burdens. *See, e.g., Howe*, 2024 2024 WL 3536830, at *6–7; *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1157–59 (D. Or. 2024); *Combs v. PeaceHealth*, No. 6:23-cv-01673-MTK, 2025 WL 92836, at *3 (D. Or. Jan. 14, 2025) (all emphasizing the combined impact of health risks and staffing burdens on organizational operations).

**c. Alternative Safety Measure Were Not Adequate Substitutions for Vaccination**

Optum determined that non-pharmaceutical safety measures, such as masking, testing, and symptom tracing, were not adequate substitutes for vaccination. ER-200-201 at ¶ 9; 203-204 at ¶16. Ledezma's admissions about her

own conduct confirmed the unreliability of such measures. She testified that she brought and wore ineffective paper masks instead of employer-provided PPE, that she sometimes did not wear a mask, and that she removed her mask when eating. ER-152-153 (Tr. 93:24–94:21).

Numerous courts have found that non-pharmaceutical interventions—such as masking, testing, and distancing—are insufficient substitutes for vaccination and thus impose an undue hardship under Title VII, rejecting the notion that such alternative measures adequately eliminate the risks posed by unvaccinated employees. In *Bushra*, 2025 WL 1078135, at *2, the Third Circuit affirmed summary judgment in favor of a healthcare employer. There, the court credited expert testimony that unvaccinated employees posed a heightened risk of COVID-19 transmission and that masking and testing were inadequate substitutes—paralleling the conclusion of Optum, guided by its internal experts on the Steering Committee, here. *See also, e.g., Williams*, 2024 WL 3993162, at *6–8 (granting defendant's motion for summary judgment while reasoning that masks and distancing were insufficient when plaintiffs worked closely with vulnerable patients); *Rolovich v. Wash. State Univ.*, No. 2:22-cv-0319, 2025 WL 48361, at *2–3 (E.D. Wash. Jan. 6, 2025) (summary judgment granted based, in part, on unrebutted expert testimony that no other accommodation could negate the risk from an unvaccinated football coach interacting with hundreds of people); *Snow v.*

*Women's Healthcare Assocs., LLC*, No. 3:23-CV-01393-IM, 2024 WL 3640111, at *8–9 (D. Or. Aug. 2, 2024) (summary judgment granted because masking and testing in lieu of vaccination were deemed insufficient where plaintiff was in-person and patient-facing); *Bird v. Alanson M. Randol, D.D.S., P.C.*, No. 6:23-CV-01678-MC, 2025 WL 553580, at *6–7 (D. Or. Feb. 19, 2025) (summary judgment for defendant where even partial in-person presence of an unvaccinated employee posed a heightened risk to patients and staff); *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674 TSZ, 2024 WL 278973, at *6-7 (W.D. Wash. Jan. 25, 2024), *aff'd,* 150 F.4th 1211 (9th Cir. 2025) (granting summary judgment for defendant because defendant presented "uncontroverted evidence" that unvaccinated firefighters posed risks even with masks and distancing).

In sum, allowing Ledezma to continue working in person at the infusion pharmacy while unvaccinated would have (1) significantly increased the risk of COVID-19 exposure and serious harm to coworkers, and (2) caused staffing disruptions that directly jeopardized Optum's ability to fulfill its patient care mission. These risks were neither hypothetical nor trivial—they were concrete, well-documented, and borne out by both public health guidance, the conclusions of its expert Steering Committee, and Ledezma's own admissions. As multiple courts have recognized, FEHA and Title VII do not compel healthcare employers to jeopardize the health and safety of their workforce or operations to accommodate

exemption requests that impose undue hardship. Given the undisputed evidence, accommodating Ledezma's request would have placed unacceptable burdens on Optum's ability to operate safely and effectively. The Court should therefore affirm summary judgment in Optum's favor and reject Ledezma's claims as a matter of law.

## VIII. CONCLUSION

This Court should affirm the District Court's grant of summary judgment to Optum on all counts.

DATED: October 16, 2025

Respectfully submitted,

SEYFARTH SHAW LLP

By: /s/ Dawn Solowey
Dawn Solowey
Lilah Wylde

Attorneys for Appellee
Optum, Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-684

I am the attorney or self-represented party.

**This brief contains 8,971 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). 1

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Dawn Solowey **Date** October 16, 2025

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)** 25-684

The undersigned attorney or self-represented party states the following:

[XX] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/ Dawn Solowey **Date** October 16, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2025, I electronically filed the foregoing **APPELLEE OPTUM, INC.'S ANSWERING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF Filing system.

I certify that all participants in the case are registered CM/ECF users and that service on all counsel of record will be accomplished via CM/ECF Filing system.

/s/ Dawn Solowey
Dawn Solowey